**IN THE COURT OF APPEALS OF IOWA**

No. 23-1402
Filed January 9, 2025

**DEN HARTOG INDUSTRIES and WEST BEND MUTUAL INSURANCE COMPANY,**
Petitioners-Appellants,

**vs.**

**TYLER DUNGAN,**
Respondent-Appellee.

_____

Appeal from the Iowa District Court for Polk County, Jeanie Vaudt, Judge.


An employer appeals from a judicial-review proceeding following an adverse decision by the workers' compensation commissioner. **AFFIRMED.**


Lee P. Hook, Morgan R. Todd Borron, and Jordan R. Reed (until withdrawal) of Peddicord Wharton, LLP, West Des Moines, for appellants.

Michael Roling and Christopher Spencer of Peddicord Wharton, LLP, West Des Moines, for appellant West Bend Mutual Insurance Company.

Janece Valentine, Fort Dodge, for appellee.


Heard by Buller, P.J., Langholz, J. and Doyle, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**BULLER, Judge.**

Den Hartog Industries and its insurer appeal from a judicial-review proceeding arising out of a contested workers' compensation case involving former employee Tyler Dungan. Den Hartog alleges a legal error in the district court and workers' compensation commissioner's interpretations of a 2017 amendment to Iowa Code section 85.34(2)(v) (2019), which could potentially affect the amount of benefits owed Dungan. Finding the district court correctly affirmed the commissioner's interpretation of ambiguous statutory language, we affirm.

## I. Background Facts and Proceedings

Most of the material facts in this case are not disputed. Dungan injured his back in July 2019 while working for Den Hartog. He promptly reported the injury to Den Hartog and saw medical providers for treatment. He missed some work while receiving medical care but continued to work for Den Hartog for the next eleven months with some restrictions.

Dungan voluntarily left his job at Den Hartog the next June to take a different job and move closer to his family. He worked a few different positions before he started at his current employer as a welder, earning more than he had while working for Den Hartog.

Dungan petitioned for workers' compensation benefits in March 2021. Following arbitration, a deputy workers' compensation commissioner determined Dungan sustained an eight percent functional impairment and awarded him industrial disability benefits based on a fifteen percent reduction in his earning capacity as well as costs and continued medical care. Den Hartog appealed to the commissioner, who affirmed the deputy's award in its entirety.

By way of background, before 2017, permanent partial disability to an unscheduled body part was compensated exclusively by an industrial disability calculation, which focuses on the loss of earning capacity.[1] As part of the 2017 legislative changes, the General Assembly amended Iowa Code section 85.34(2)(v), which in pertinent part reads:

> In all cases of permanent partial disability other than those hereinabove described[,] . . . the compensation shall be paid during the number of weeks in relation to five hundred weeks as the reduction in the employee's earning capacity caused by the disability bears in relation to the earning capacity that the employee possessed when the injury occurred. . . . If an employee who is eligible for compensation under this paragraph returns to work or is offered work for which the employee receives or would receive the same or greater salary, wages, or earnings than the employee received at the time of the injury, the employee shall be compensated based only upon the employee's functional impairment resulting from the injury, and not in relation to the employee's earning capacity. Notwithstanding section 85.26, subsection 2, if an employee who is eligible for compensation under this paragraph returns to work with the same employer and is compensated based only upon the employee's functional impairment resulting from the injury as provided in this paragraph and is terminated from employment by that employer, the award or agreement for settlement for benefits under this chapter shall be reviewed upon commencement of reopening proceedings by the employee for a determination of any reduction in the employee's earning capacity caused by the employee's permanent partial disability.

The workers' compensation commissioner interpreted the bifurcation process to only apply when a worker returns to work for the employer *and* is later terminated by the same employer. Under that reasoning, the commissioner determined the

---

[1] Earning capacity is focused "on the ability of the worker to be gainfully employed." *Keystone Nursing Care Ctr. v. Craddock*, 705 N.W.2d 299, 306 (Iowa 2005) (citation omitted). In this opinion, when we refer to industrial disability, we mean the reduction in earning capacity. *See Loew v. Menard, Inc.*, 2 N.W.3d 880, 884 (Iowa 2024) ("Determining an injured employee's compensation based on the employee's reduction in earning capacity is known as the industrial method.").

functional impairment provision did not apply to Dungan because he voluntarily separated from Den Hartog. As a result, the commissioner determined the bifurcated process established by section 85.34(2)(v) linking benefits to functional impairment did not apply to Dungan, and the commissioner instead calculated his industrial disability.

Den Hartog petitioned for judicial review in the district court, urging that section 85.34(2)(v)'s bifurcated process applied regardless of whether the employee was terminated or voluntarily separated from the employer. The court affirmed the commissioner, criticizing Den Hartog's position as asking the court to ignore part of the statutory text and finding that the statute read as a whole only imposed the bifurcated process when the employee returned to work and was then terminated by the employer. Den Hartog appealed, and the supreme court transferred this matter to our court for resolution.

## II. Standards of Review

We review the interpretation of the workers' compensation statute for correction of errors at law, without deference to the agency's legal interpretation. *Chavez v. MS Tech. LLC*, 972 N.W.2d 662, 666 (Iowa 2022). If the commissioner's factual determinations are supported by substantial evidence, we are bound by them. *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 526 (Iowa 2012).

## III. Discussion

There are essentially two parts to this appeal—statutory interpretation and application of the statute to the facts to determine Dungan's industrial disability rating. We address each separately.

**A. Statutory Interpretation**

On the legal question, we must determine for the first time how Iowa Code section 85.34(2)(v) applies in the circumstance of a voluntary quit. "Our first step in statutory interpretation is to determine whether the language is ambiguous." *State v. Richardson*, 890 N.W.2d 609, 616 (Iowa 2017).

The supreme court recently looked at compensation under this section, explaining:

> Section 85.34(2)(v) provides two methods for calculating compensation for a nonscheduled permanent partial disability. Compensation shall be paid using the industrial method based on "the reduction in the employee's earning capacity caused by the disability." However, when an employee returns to work at the "same or greater salary, wages, or earnings than the employee received at the time of the injury," then "the employee shall be compensated based only upon the employee's functional impairment resulting from the injury, and not in relation to the employee's earning capacity." Here, Loew suffered a nonscheduled injury to his lower back, and he returned to work at the same or greater compensation. Because Loew returned to work at the same or greater compensation, he was entitled to compensation "based only upon [his] functional impairment resulting from the injury."

*Loew*, 2 N.W.3d at 886–87 (internal citations omitted). Although this language brushes up against the issue in this case, it does not squarely resolve it.

In our view, we find the statutory language recognizes two categories under section 85.34(2)(v) with different bases for calculation compensation: (1) if the employee returns to work at the same or greater pay, then they are compensated for their functional impairment; and (2) if the employee does not return to work at the same or greater pay, then the industrial disability calculation applies. *Bridgestone Ams., Inc. v. Anderson*, 4 N.W.3d 676, 682 (Iowa 2024). The statute provides for those involuntarily moved from the first category to the second with a

bifurcated compensation process to seek additional industrial disability compensation. *See* Iowa Code § 85.34(2)(v). But the statute does not address those who voluntarily do not return to work or those who return to work but leave voluntarily. As a result, we find the statute ambiguous—a conclusion supported by the vigorous briefing seen from both parties in this case, as they attempt to interpret opaque statutory language. *See Richardson*, 890 N.W.2d at 616 ("A statute is ambiguous if reasonable minds differ or are uncertain as to the meaning of the statute." (citation omitted)). And we think this lack of clarity in the statutory language has created uncertainty between employees and employers as to when and how the different compensation rates apply to employees whose injuries are governed by paragraph (v).

Under controlling precedent, we are required to "apply the workers' compensation statute broadly and liberally in keeping with its humanitarian objective: the benefit of the worker and the worker's dependents." *Xenia Rural Water Dist. v. Vegors*, 786 N.W.2d 250, 257 (Iowa 2010). This prescribed approach supports affirming the interpretation of the commissioner and the district court, as both interpreted ambiguous language to benefit the worker, and it weighs against reversing in favor of the employer for the same reason. As a result, we hold the district court did not err at law when it affirmed the commissioner's conclusion that the functional-impairment analysis did not apply to Dungan, because Dungan was not terminated from employment. Instead, this case falls within the first sentence of paragraph (v)—and the longstanding practice for compensation of unscheduled injuries—"the compensation shall be paid . . . as the reduction in the employee's earning capacity caused by the disability bears in

relation to the earning capacity that the employee possessed when the injury occurred." Iowa Code § 85.34(2)(v).

In so holding, we recognize the statutory language is subject to multiple interpretations. Forced to choose between competing interpretations, case law compels we err on the side of the employee and historical practice. *See Xenia*, 786 N.W.2d at 257.

## B. Industrial Disability Rating

Den Hartog also contests the amount of industrial disability awarded, contending fifteen percent was too high. In calculating industrial disability, the commissioner is permitted to consider a variety of factors, not all of which apply to every case:

> the employee's medical condition prior to the injury, immediately after the injury, and presently; the situs of the injury, its severity and the length of the healing period; the work experience of the employee prior to the injury and after the injury and the potential for rehabilitation; the employee's qualifications intellectually, emotionally, and physically; earnings prior and subsequent to the injury; age; education; motivation; functional impairment as a result of the injury; inability, because of the injury, to engage in employment for which the employee is fitted; loss of earnings caused by a job transfer for reasons related to the injury; and the employer's refusal to give any sort of work to an impaired employee.

*IBP, Inc. v. Al-Gharib*, 604 N.W.2d 621, 632–33 (Iowa 2000) (identifying relevant factors from *McSpadden v. Big Ben Coal Co.*, 288 N.W.2d 181, 192 (Iowa 1980)). "The . . . commissioner is not required to fix disability with precise accuracy." *Myers v. F.C.A. Servs., Inc.*, 592 N.W.2d 354, 357 (Iowa 1999). And we are mindful the assessment must concern the employee's general earning capacity in the competitive labor market, not just a comparison of wages between specific roles or specific employers. *See id.* at 356.

Without dwelling unnecessarily on the details, we find the commissioner's decision supported by substantial evidence. Dungan had decades left in the workforce, some ongoing lift restrictions while working in a manual-labor industry, was motivated to work, and had to obtain subsequent employment at a "quite accommodating" employer compared to his previous work-seeking without restriction. Dungan also continued to have lower-back pain and required some degree of continuing treatment. Den Hartog's most targeted argument on this point suggests Dungan's disability is not permanent. But every expert report in the record concludes otherwise. We find substantial evidence plainly supports the commissioner's determination on the amount of industrial disability and the judicial-review court's affirmance of the same.

## IV.    Disposition

We affirm the district court's judicial-review ruling, which in turn affirmed the agency action of the workers' compensation commissioner.

**AFFIRMED.**

Doyle, S.J., concurs; Langholz, J., dissents.

**LANGHOLZ, Judge** (dissenting).

The governing workers' compensation statute provides that an employee with an unscheduled injury "shall be compensated based only upon the employee's functional impairment resulting from the injury, and not in relation to the employee's earning capacity" if the employee "returns to work or is offered work for which the employee receives or would receive the same or greater salary, wages, or earnings than the employee received at the time of the injury." Iowa Code § 85.34(2)(v) (2019). All agree that Tyler Dungan returned to work and received the same or greater earnings. Yet Dungan argues this provision cannot apply to him because the next sentence in the statute—granting a special review-reopening right to a subset of returning employees who are then terminated by their original employer—does not apply to him. The workers' compensation commissioner agreed, awarding industrial disability benefits based on his earning capacity. And the majority affirms, though based mainly on its conclusion that the statute is ambiguous. But since the statute's plain and unambiguous text requires Dungan to "be compensated based only upon [his] functional impairment resulting from the injury, and not in relation to [his] earning capacity," I respectfully dissent.

I.

To answer this question of statutory interpretation, I would have "started (and ended) . . . with the language of the relevant statute." *Second Inj. Fund v. Strable*, __ N.W.3d __, __, 2024 WL 5100098, at *5 (Iowa 2024). Paragraph "v" of Iowa Code section 85.34(2) governs compensation for unscheduled injuries causing permanent partial disabilities. *See* Iowa Code § 85.34(2)(v); *Loew v. Menard, Inc.*, 2 N.W.3d 880, 886–87 (Iowa 2024). Its first two sentences provide

a default rule for compensating such injuries based on a loss of earning capacity, often referred to in practice and precedent as "the industrial method." *Loew*, 2 N.W.3d at 884. But its third sentence creates an exception to the default rule:

> If an employee who is eligible for compensation under this paragraph returns to work or is offered work for which the employee receives or would receive the same or greater salary, wages, or earnings than the employee received at the time of the injury, the employee shall be compensated based only upon the employee's functional impairment resulting from the injury, and not in relation to the employee's earning capacity.

Iowa Code § 85.34(2)(v). A plain reading of this text tells us that a set of employees with unscheduled injuries must be compensated based on their "functional impairment" from their injuries rather than the default industrial method. *Id.* And it tells us the condition needed for this exception to apply—when an employee "returns to work or is offered work" at the same or greater pay as before the injury. *Id.*; *see also Loew*, 2 N.W.3d at 887.

Dungan returned to work after suffering an unscheduled injury. At first, he worked for the same employer as before the injury at the same hourly wage. But he later resigned to take a position with a different employer where he earned greater wages than at the time of the injury. He was still working at this higher pay at the time of the hearing before the deputy workers' compensation commissioner.

So applying the plain meaning of paragraph "v," Dungan satisfies the condition for the exception to apply because he is an employee who returned to work at the same or greater pay as he had before the injury. And thus, the statute requires that he be compensated based on his functional impairment from his injury rather than the default industrial method.

Despite this straightforward statutory interpretation and application, Dungan argues that the functional-impairment exception does not apply to him. He reasons that to properly interpret the functional-impairment exception in the third sentence of paragraph "v," we must also consider the fourth sentence:

> Notwithstanding section 85.26, subsection 2, if an employee who is eligible for compensation under this paragraph returns to work with the same employer and is compensated based only upon the employee's functional impairment resulting from the injury as provided in this paragraph and is terminated from employment by that employer, the award or agreement for settlement for benefits under this chapter shall be reviewed upon commencement of reopening proceedings by the employee for a determination of any reduction in the employee's earning capacity caused by the employee's permanent partial disability.

Iowa Code § 85.34(2)(v). And Dungan contends—adopting the reasoning of the commissioner in this and other cases[2]—that reading the two sentences together shows that "the legislature set up a bifurcated litigation process" that "only applies when the defendant-employer discharges the claimant after the agency issues an award or approves the parties' agreement for settlement on the question of permanent disability based on functional impairment." (Cleaned up.) In essence— according to this reasoning—because the two sentences are linked, the third sentence's functional-impairment exception should only apply when the fourth sentence's reviewing-reopening right applies. So because Dungan voluntarily left his original employment rather than being terminated, the entire bifurcated process would not apply and he would be compensated under the default industrial method based on earning capacity rather than under the functional-impairment exception.

---

[2] *See Martinez v. Pavlich, Inc.*, No. 5063900, 2020 WL 5412838, *3–6 (Iowa Workers' Comp. Comm'r July 30, 2020) (detailing the commissioner's statutory-interpretation reasoning, which was followed as binding agency precent here).

I agree with Dungan that we should look to the fourth sentence to inform our interpretation of the third. *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) [hereinafter *Reading Law*] ("The text must be construed as a whole . . . which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts."). That's especially so where, as here, the two sentences were added to the statute in the same enactment. *See State v. Hall*, 969 N.W.2d 299, 309 (Iowa 2022) ("The contrast between the statutes is particularly revealing because both statutes were passed at the same time in the same piece of legislation."); *see also* 2017 Iowa Acts ch. 23, § 8. But when examining the text of the related sentences, I see two distinctions that show the third sentence's exception requiring compensation based on functional impairment must apply to a broader universe of employees than the fourth sentence's review-reopening right.

First, the fourth sentence applies only to an employee who "returns to work with the same employer." Iowa Code § 85.34(2)(v). The third sentence contains no such requirement that the work be "with the same employer." *Id.* This use of materially different terms shows us that the scopes of the two sentences are not coextensive—"different meanings are intended" for each. *Teig v. Chavez*, 8 N.W.3d 484, 493 (Iowa 2024). "If the drafters intended the two concepts to be coextensive, different words would not have been used." *Id.* (cleaned up); *see also Reading Law* at 170 ("[W]here the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea."). Dungan's interpretation—that the third sentence's functional-impairment exception would only apply when the fourth sentence's

narrower condition of returning to the same employer is satisfied—fails to give meaning to these differences and thus flouts the statutory text.

Second, the third sentence applies to some employees who never return to work at all—those who are merely "offered work." Iowa Code § 85.34(2)(v). Dungan's interpretation would strike these words out of the statute. An employee who is offered but does not return to work with the same employer could never be terminated by that employer. So the review-reopening right of the fourth sentence could never apply. And under Dungan's interpretation, the third sentence's functional-impairment exception could thus never apply to those "offered work." *Id.* That can't be. "[W]e must giving meaning to every word in a statute. None should be ignored. None should needlessly be given an interpretation that causes it to have no consequence." *Bridgestone Americas, Inc. v. Anderson*, 4 N.W.3d 676, 686 (Iowa 2024) (cleaned up); *see also Reading Law* at 174 ("It is no more the court's function to revise by subtraction than by addition.").

And so, both these distinctions between the two sentences defeat Dungan's argument that the third sentence's functional-impairment exception applies only when the fourth sentence's review-reopening right applies. To faithfully give meaning to the sentences' distinctions, we must read the third sentence to require compensation based on functional impairment for one set of employees with unscheduled injuries: those who return to work or are offered employment at the same or greater pay as before the injury. And the fourth sentence then moderates the consequences of this exception for a smaller subset: those who returned to work for the same employer, had their original award or settlement based on the functional-impairment method required by the third sentence, and then were

terminated by that same employer. This subset of employees is granted the right to bring a review-reopening proceeding in which they can seek a redetermination of their compensation using the industrial method based on their loss of earning capacity. Interpreting the two sentences in this way harmonizes them. *See Reading Law* at 180 ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously."). And it gives the most natural reading to all the words in the statute.

Dungan's contrary interpretation seems to flow in large part from an underlying assumption that the legislature intended to require compensation by the functional-impairment method only as part of a "bifurcated process" in which the employee could eventually have a chance for compensation by the industrial method. And given the longstanding use of the industrial method for compensating unscheduled injuries, it's understandable that those involved in the workers' compensation system might assume that it should always remain available. But that assumption has no basis in the current text of the statute. The statute never uses the term "bifurcated process." And as already discussed, it defines the scope of the functional-impairment exception more broadly than the scope of the review-reopening right. If the legislature meant for the functional-impairment exception to apply only when the review-reopening right also applied, there are many ways the legislature could have written that meaning into the statute. But the words enacted into law are not one of them. *See State v. Hightower*, 8 N.W.3d 527, 539 (Iowa 2024) (explaining that "[t]o find the meaning of [a statute], we must focus on its text, the words chosen by the legislature" and rejecting attempt to add an additional requirement for the applicability of a statute when those words "offer no support").

II.

The majority affirms the commissioner's interpretation—or at least its top-line conclusion that paragraph "v"'s default industrial method of compensation applies to Dungan—reasoning that the statute is ambiguous and thus must be interpreted "broadly and liberally" to "the benefit of the worker." *Xenia Rural Water Dist. v. Vegors*, 786 N.W.2d 250, 257 (Iowa 2010)*.* To find the statute ambiguous, the majority agrees with Dungan and the commissioner that the statute "does not address those who voluntarily do not return to work or those who return to work but leave voluntarily." But that's not so.

True, the fourth sentence does not grant the review-reopening right to either category the majority identifies. But it's the third sentence that covers the issue here—whether the functional-impairment exception applies. And that text plainly addresses Dungan's situation and the other categories that the majority finds ambiguous. "[T]hose who voluntarily do not return to work"? If the employee was "offered work for which the employee . . . would receive the same or greater salary, wages, or earnings than the employee received at the time of the injury," then the functional-impairment exception applies. Iowa Code § 85.34(2)(v). And "those who return to work but leave voluntarily"? Again, if they "receive[] . . . the same or greater salary, wages, or earnings than the employee received at the time of the injury" upon their return to work, the exception applies. *Id.* I'm not sure what more we would expect the legislature to say to be clear that it intends the functional-impairment exception to apply to the employees it has already expressly specified.

Of course, if one overlooks the clear distinctions between the two sentences or accepts the atextual bifurcated-process assumption, the proper interpretation

can become murkier. All the more so when we have appropriately zealous advocacy making thoughtful arguments on both sides. "But a statute is not ambiguous merely because two litigants"—or "skilled lawyers," administrative judicial officers, or judges—"disagree about its meaning." *Est of Butterfield v. Chautauqua Guest Home, Inc.*, 987 N.W.2d 834, 838 (Iowa 2023) (cleaned up). Nor do the "legislative purposes," such as "the purpose of helping workers" give us "leave to ignore the plain language of the statute." *Bridgestone*, 4 N.W.3d at 683 (cleaned up). And so, when properly focusing on the plain meaning of the text of the statute, I see no ambiguity that would permit me to default to Dungan's interpretation just because it benefits workers.[3]

III.

Dungan also urges us—regardless of the result we reach—to give guidance to the workers' compensation bar and commissioner about the application of paragraph "v" beyond the facts here. While I can understand that desire, there is wisdom in fleshing out the meaning of statutes with our normal case-by-case approach—deciding only what must be decided to resolve a particular case with the benefit of adversarial briefing by parties with a direct stake in the issues decided and a full factual record on which to apply the terms we interpret. So as the commissioner has thoughtfully explained, the agency will still need to "act[] as

---

[3] In any event, Dungan's preferred interpretation does not always benefit workers. *See Loew*, 2 N.W.3d at 889 ("A claimant may suffer a functional disability but have no industrial disability if the functional disability does not impede his ability to perform the duties of his employment." (cleaned up)). Indeed, the first case in which the commissioner interpreted paragraph "v" was one in which the employer—not the employee—argued for the application of the industrial-method because it thought the employee's loss of earning capacity would be less than the functional impairment. *See Martinez*, 2020 WL 5412838, *6.

the front-line authority in interpreting statutory workers' compensation provisions," especially on these relatively recent amendments. *Martinez*, 2020 WL 5412838, at *4.

That said, I believe that the interpretative approach that I use above—based on a plain reading of all the text without additions or subtractions—would provide greater clarity to those seeking to apply the statute to other factual circumstances than either Dungan's or the majority's. To be sure, some of those circumstances will present closer questions than this case. For example, it is not necessary to decide here whether the statute's use of the present tense—"returns to work"—means that the return must continue up to the date of the hearing because Dungan was still working at that time here. Nor do we need to wrestle with the related question of what happens if the employee returns to the original employer and is terminated by that employer *before* being compensated under the functional-impairment method. In such a situation, the review-reopening right clearly couldn't apply—but absent an interpretation of "returns" that continues to the time of compensation, the functional-impairment exception would seem to still apply. And since Dungan returned to work, we do not face deciding what requirements, if any, beyond offering the same or greater pay may be implied—perhaps based on other parts of chapter 85—for an offer of work to meet the condition for the functional-impairment exception. But I would wait to resolve these questions until we have the benefit of adversarial briefing and the commissioner's adjudication of them before us. *See Whitehouse v. Ill. Cent. R.R. Co.*, 349 U.S. 366, 372–73 (1955) (counseling that close questions' "difficulty admonishes us to observe the wise

limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case").

For now, we need only correct the commissioner's erroneous interpretation of the statute here. Because Dungan returned to work and received the same or greater earnings as he did at the time of his unscheduled injury, the plain and unambiguous text of paragraph "v" requires Dungan to "be compensated based only upon [his] functional impairment resulting from the injury, and not in relation to [his] earning capacity." Iowa Code § 85.34(2)(v). I would thus reverse the district court's and workers' compensation commissioner's contrary interpretation of the statute and remand for the commissioner to decide an award based only on Dungan's functional impairment.